## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CRIMINAL ACTION**

**VERSUS**

**JOSE BASTARDO-VILLANUEVA**                **No. 15-00176-BAJ-RLB-1**

### RULING AND ORDER

Before the Court is a motion to suppress evidence filed by Jose Bastardo-Villanueva ("Defendant"). (Doc. 23). The United States of America has filed a response. (Doc. 24). The Court held a hearing on Defendant's motion on August 1, 2016. During the hearing, the Court heard testimony from East Baton Rouge Sheriff's Officer Shannon Graham ("Officer Graham") and accepted into evidence, *inter alia*, a video depicting Defendant's traffic stop. For the following reasons, Defendant's motion is **DENIED**.

### I.   BACKGROUND

This matter arises from a routine traffic stop of a vehicle operated by Defendant. At approximately 3:16 a.m. on September 3, 2015, Officer Graham pulled over Defendant for veering outside his lane and following another vehicle too closely. Defendant was the sole occupant of the vehicle. Officer Graham was patrolling with his drug canine, Mylo, at the time of the stop, and he was not with another officer.

At approximately 3:17 a.m., Officer Graham approached Defendant's passenger window to request his driver's license and vehicle information. Defendant handed over his Pennsylvania issued driver's license and a copy of a rental agreement

for the vehicle. Officer Graham testified that Defendant appeared nervous during this initial encounter. Specifically, Officer Graham testified that Defendant's breathing was elevated and his hand was shaking, which caused him to drop his driver's license as he was attempting to hand it over to the officer. Officer Graham later testified that he did not notice this nervous behavior during the remainder of the stop.

Upon receiving this information, Officer Graham told Defendant to exit his vehicle and stand behind it. At approximately 3:18 a.m., Officer Graham began to question Defendant about his travel itinerary and the length of time he had been on the road.[1] Defendant told Officer Graham that he flew from Philadelphia to Houston to visit family. Defendant also indicated that he was driving back to Philadelphia because driving was less expensive than flying. Sometime during their conversation, Officer Graham testified that he noticed that Defendant's rental agreement had a return time and date of 2:30 p.m. on September 1, 2015, and a designated drop-off location in Houston. Officer Graham became aware that Defendant's vehicle was approximately two days past due, and he took notice of the fact that Defendant was traveling on a highway in the opposite direction of the vehicle's drop-off location.

At approximately 3:20 a.m., Officer Graham returned to his cruiser to enter into his computer Defendant's license and vehicle information to run a routine search.[2] Officer Graham testified that he wanted to determine if a "failure to return

---

[1] Officer Graham asked Defendant if he was tired and told him that he was pulled over for "swerving a little bit" and following other vehicles too closely. Defendant replied that he was tired and that he would pull over to find a hotel.

[2] Shortly after Officer Graham returned to his cruiser, sounds of shuffling papers can be heard. The audio recording is largely silent through approximately 3:27 a.m., at which time his microphone cuts off. Audio resumes at approximately 3:28 a.m. with the voice of Sergeant Hale speaking mid-sentence.

a leased movable" had been reported related to Defendant's rental.[3] While in his cruiser, Officer Graham testified that he communicated with Sergeant Jessie Hale, who was patrolling nearby, to discuss the possibility that he had come upon a stolen vehicle. At approximately 3:28 a.m., the video of the stop captures audio of Sergeant Hale stating mid-sentence that he is going to run Defendant's license plate again on the interstate license plate reader ("LPR") system, which would take "a few minutes," because the initial information he got "did not make no sense if the reader is right."[4] Officer Graham responded by asking Sergeant Hale to "ease this way," and he told him that he was going to "run Mylo on him while he waits for this information to come up." Officer Graham testified that he requested Officer Hale to come to his location for safety purposes and to verify information about Defendant's past travel.

At 3:30 a.m., Officer Graham exited his vehicle and told Defendant "it's going to be a few more minutes." Officer Graham then asked Defendant additional

---

[3] La.R.S. 14:220 is titled "Leased movables; obtaining by false representation; failure to return or surrender; penalties; restitution." The statute reads in pertinent part:

A.  No person leasing a movable shall obtain or retain possession of the movable by:

* * *

(2) Intentionally failing to return or surrender the movable when obligated under the terms of the lease, or after the expiration or cancellation of the lease . . . .

[4] Defendant responded to Officer's Graham's questions in English. The video indicates that a language barrier complicated portions of the conversations between Officer Graham and Defendant. At one point, Officer Graham asked Defendant if he rented the car "today or yesterday?" Defendant responded, "No, uh, today. I got like a week." Officer Graham testified that he believed Defendant had rented the car in Houston that day for a one week period, which contradicted information gathered by Sergeant Hale during his first LPR scan. At oral argument, Defendant argued that he clearly meant to convey that he had rented the vehicle one week prior. Regardless, the Court is able to reach a decision without addressing this discrepancy. *But see Pena-Gonzalez*, 618 F. App'x at 200 (instructing that "the question is whether it was reasonable for someone in [the officer's] shoes to view the answers as suspicious, not whether they are convincing proof" that someone being detained is lying).

3

questions about his time in Houston. Sergeant Hale arrived on the scene at approximately 3:31 a.m. After Sergeant Hale arrived, Officer Graham began to conduct a canine search at approximately 3:32 a.m. Officer Graham testified that he decided to conduct a canine search in light of Defendant's atypical travel itinerary and his suspicion that Defendant's vehicle may be stolen.[5] Officer Graham further testified that he had not obtained results from his computer search when he ran Mylo on the exterior of Defendant's vehicle.

Within moments of beginning the search, Mylo signaled a positive alert for the presence of narcotics. Officer Graham then obtained consent to search Defendant's vehicle. Officer Graham and Sergeant Hale found approximately 2.4 pounds of cocaine in the vehicle's bumper. The vehicle was subsequently searched pursuant to a search warrant. This search resulted in the discovery of an additional 4.7 pounds of cocaine. On December 16, 2015, a federal grand jury returned a one-count indictment charging Defendant with possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1).

## II.   ARGUMENT OF THE PARTIES

Defendant argues that his stop was prolonged beyond the time necessary for Officer Graham to issue any traffic citation and to run a computer search of his license

---

[5] Officer Graham testified at one point that he ran Mylo because, "[Defendant] stated that he had flown from Philadelphia to Houston, as I said, and then, now he was – had just rented a vehicle – and driving back home for I'm guessing monetary reasons or whatever – for expense reasons I believe that is what it was. Which I—to me—I felt like maybe flying would have been a little cheaper, and faster, and more convenient, and I really didn't understand that. And with the vehicle being past due and actually I believe Sergeant Hale had ran the license plate in the camera system, the LPR, and it actually had shown the vehicle being traveled through Louisiana on the first, so that would have contradicted his story of being in Houston for the time that he had said he was in."

and vehicle information. (Doc. 23-1 at pp. 6—8). Defendant also argues that the canine search of his vehicle was not independently supported by additional individualized suspicion of criminal activity. (*Id.* at p. 7). To support his motion, Defendant relies in large measure on the United States Supreme Court's recent decision in *Rodriguez v. U.S.*, ___ U.S. ___, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015). (Doc. 23-1 at pp. 6—8).

In response, the United States urges that the canine search of Defendant's vehicle "occurred during a legitimate traffic stop and did not prolong the time necessary to conduct the tasks related to the original purpose of the stop." (Doc. 24 at p. 4). The United States indicated that it would "prove at a hearing on the defendant's motion that the search was justified and that his motion should be denied." Thus, the United States made clear its intent to rely on the video of Defendant's stop and the testimony of Officer Graham to develop the factual circumstances justifying the contested canine search.

## III.   LAW AND ANALYSIS

As a preliminary matter, Defendant does not challenge the lawfulness of his initial stop.[6] The Court therefore accepts at true Officer Graham's uncontroverted testimony that Defendant committed traffic violations to justify his stop. Beyond his testimony on this narrow point, the Court further finds that Officer Graham was a

---

[6] Without further explanation or argument, Defendant states in his motion that his stop "was arguably justified at its inception." (Doc. 23-1 at p. 8). Defendant did not testify about the circumstances underlying his initial stop, nor did he question Officer Graham about the traffic violations that caused him to initiate the stop.

credible witness who testified truthfully about the circumstances surrounding the entirety of Defendant's traffic stop.

### A. Prolonging the Stop

In *Rodriguez*, the United States Supreme Court held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez*, 135 S.Ct. at 1612. To evaluate the lawfulness of canine searches during routine traffic stops, the Supreme Court instructed that "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id*. at 1616 (citations omitted).

The Court in *Rodriguez* concluded that a canine search of a vehicle during a routine traffic stop is unlawful when it prolongs the stop beyond the time necessary for an officer to conduct certain inquiries and issue a ticket, *unless* reasonable suspicion of criminal activity distinct from the traffic offense is developed that is "ordinarily demanded to justify detaining an individual." *Id*. at 1614—15 (citation omitted); *see also U.S. v. Pena-Gonzalez,* 618 F. App'x 195, 198 (5th Cir. 2015) (quoting *U.S. v. Fishel*, 467 F.3d 855, 857 (5th Cir. 2006)) (interpreting *Rodriguez* and holding that officers are allowed to "examine the driver's license and vehicle registration . . . [and] ask about the purpose and itinerary of the driver's trip"). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S.Ct at 1615 (citations omitted).

The Supreme Court stated that its holding in *Rodriguez* is supported by precedent set forth in *Illinois v. Caballes*, 543 U.S. 405, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) and *Arizona v. Johnson*, 555 U.S. 323, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009). *Rodriguez*, 135 S.Ct. at 1614 ("In both cases, we concluded that the Fourth Amendment tolerated certain unrelated investigations that did not lengthen the roadside detention."). Like *Rodriguez*, the Supreme Court in *Caballes* addressed the lawfulness of canine searches conducted on vehicles during routine traffic stops.[7] *See Caballes*, 543 U.S. at 405.

In *Caballes*, an officer stopped a driver for speeding. *Id.* at 406. While the officer who effectuated the stop was in the process of writing the driver a ticket, another officer conducted a canine search of the outside of the driver's vehicle. *Id.* at 406—407. The Supreme Court held that "[a] dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id.* at 410. In cautionary language expanded upon in *Rodriguez*, the Supreme Court also stated that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Id.* at 407.

---

[7] The decision in *Johnson* does not address canine searches of vehicles during routine traffic violations. *See Johnson*, 555 U.S. 323. Relevant to the decision in *Rodriguez*, the Supreme Court stated in *Johnson* that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* at 788 (citation omitted).

7

The United States did not elicit testimony during the hearing indicating the time typically required to run the computer search conducted by Officer Graham. Although Officer Graham testified credibly that he ran Mylo while he awaited results of his routine computer search, he also testified that his computer search was prolonged by system malfunctions. He later testified that he does not know if he ever obtained the information he sought, that it is not unusual for the computer system to malfunction, and that the system has difficulty processing certain out of state licenses.

The United States asks the Court to find that Defendant's stop was not prolonged by the canine search, because Officer Graham had yet to get the results of his routine computer search. Such a finding invites the Court to speculate whether Officer Graham could have ascertained the information he sought more quickly if he had remained in his vehicle to trouble shoot any difficulties he encountered. Likewise, the argument of the United States invites the Court to speculate whether a canine search during a routine traffic stop is permissible during a delay caused by malfunctioning police equipment. Without more information, the Court pretermits making a finding on this issue. The Court has sufficient information, however, to find that Officer Graham had reasonable suspicion of criminal activity to justify any brief delay the canine search of Defendant's vehicle *may* have caused.

### B. Reasonable Suspicion

The analysis for determining the existence of reasonable suspicion was succinctly set forth in *U.S. v. Spears*, 636 F. App'x 893, 897 (5th Cir. 2016):

Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure. Although an officer's reliance on a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard. The reasonable suspicion analysis is necessarily fact-specific, and factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion. We must pay heed to the Supreme Court's admonition not to treat each factor in isolation, and instead must consider the totality of the circumstances and the collective knowledge and experience of the officer. Under the collective knowledge doctrine, reasonable suspicion can vest through the collective knowledge of the officers involved in the search and seizure operation.

(quotations and citations omitted).

Officer Graham has been an officer assigned to the canine division of the East Baton Rouge Parish Sheriff's Office for twelve years.[8] He testified that when he initially asked for Defendant's license, Defendant's hand was visibly shaking which caused him to drop it. Officer Graham further testified that he noticed shortly into the stop that Defendant was driving a rented vehicle nearly two days past the return date memorialized in the rental agreement.[9] He also testified that he did not understand why Defendant would be driving in the opposite direction of the drop-off location designated for the vehicle in the rental agreement. Lastly, Officer Graham testified that he was suspicious of Defendant's travel itinerary considering he flew to

---

[8] Officer Graham also stated that he has been assigned to the DEA task force in Baton Rouge, but he did not specify the duration of this assignment.

[9] In response to questioning by defense counsel, Officer Graham testified that he did not notice a provision in the rental agreement that read "[a]dditional fees may apply if changes are made to your return date, time and/or location." The Court notes that the video reflects that Defendant never told Officer Graham that his rental agreement was extended, nor did he establish during the hearing that the agreement was in fact modified.

Houston but was making the drive back to Pennsylvania. Officer Graham indicated that he did not believe Defendant's explanation that renting a vehicle and driving such a long distance was more economical than purchasing a round-trip flight.

After carefully considering all of the evidence in context, including Officer Graham's testimony and the video and audio recording of the traffic stop, the Court finds that reasonable suspicion of criminal activity developed during Defendant's stop to justify an extension of the encounter. Thus, assuming *arguendo* that the contested canine search resulted in an extension of time otherwise needed to complete Defendant's traffic stop, it nonetheless did not violate the Fourth Amendment. *See Rodriguez*, 135 S.Ct. at 1615. The fifteen minute period between Defendant's initial stop and the contested canine search was not unreasonably long given Officer Graham's early formation of reasonable suspicion of criminal activity. *See U.S. v. Pack*, 612 F.3d 341, 345—46 (5th Cir. 2010), *modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010) (reasonable suspicion of criminal activity developed after the initial stop justified a 35 minute stop). This is not a case where the officer who effectuated the stop had to wait for a canine to be brought to the scene once reasonable suspicion of criminal activity was formed. *See Spears*, 636 F. App'x at 905 (Costa, J., concurring) (noting that "[t]here is a vast difference between a situation in which a canine has already arrived and one in which a canine has not even been located. In the former, the end of the 'reasonable suspicion' stop is in sight").

Mylo's positive alert for the presence of narcotics gave Officer Graham probable cause to search Defendant's vehicle, irrespective of any consent Defendant

subsequently gave. *See U.S. v. Sanchez-Pena*, 336 F.3d 431, 444 (5th Cir. 2003) (recognizing that an alert by a drug-detecting dog provides probable cause to search an automobile). For this reason, the Court need not address the issue of consent.

## IV.   CONCLUSION

Officer Graham was justified in pulling over Defendant. Officer Graham developed reasonable suspicion of criminal activity while he was carrying out the mission of the traffic stop. The canine search of Defendant's vehicle did not unreasonably prolong Defendant's stop in light of Officer Graham's reasonable suspicion that Defendant was engaged in criminal activity. For these reasons, Defendant's motion to suppress (Doc. 23) is **DENIED**.

Baton Rouge, Louisiana, this 29th day of August, 2016.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**